# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00563-CV

### C. A. C., Appellant

#### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 313,577-B, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

C.A.C. (Father) appeals from the trial court's decree of termination appointing the Texas Department of Family and Protective Services as the managing conservator of his child (Child) and terminating his parental rights.[1] The trial court found by clear and convincing evidence that statutory grounds for terminating Father's parental rights existed and that termination was in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (Q), (2). On appeal, Father complains about the trial court's denial of possession and access to Child's paternal grandmother (Grandmother)[2] and contends that the evidence was legally and factually

---

[1] We refer to C.A.C. by his initials or as Father, and to Child's mother as Mother. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Mother's parental rights to Child were terminated in the decree, but she did not appeal.

[2] Grandmother is Father's biological grandmother, but she adopted Father when he was a child. Grandmother intervened in the case and participated as a party at trial, but she has not appealed from the decree of termination.

insufficient to support the trial court's predicate-grounds and best-interest findings. For the following reasons, we affirm the decree of termination.

## BACKGROUND

Father was indicted in April 2019 for aggravated assault with a deadly weapon for shooting a man with a firearm and incarcerated in May 2019. After Father was incarcerated, Mother, who was pregnant with Child, began living with Grandmother. Child was born in August 2019 and lived with Mother and Grandmother at Grandmother's home until November 2019 when the Department removed Child. The Department filed an original petition in a suit affecting the parent-child relationship and requested an emergency order for protection arising from Mother's drug use and an unsafe living environment. In the supporting affidavit, the investigator averred that the home's condition was concerning,[3] that Mother was a "well-known drug user and meth [was] her drug of choice," and that Father "[was] currently in jail for shooting someone in the back." The trial court signed an emergency order for protection and placed Child in foster care. Approximately two months later, Child was placed with fictive kin after the home study on their home was approved and the home study on Grandmother's home was not.

In May 2020, Grandmother filed a petition in intervention seeking to be appointed sole managing conservator of Child, and she and Father participated in the bench trial that occurred several months later. Mother did not appear for trial. The Department's witnesses

---

[3] The investigator averred that "a strong foul odor of animal feces and urine could be smelled just standing outside the front door," "[t]he floors inside the home were observed to be covered in feces and urine," "[t]he grout in the tile was black with caked on feces and urine," and "[t]he bottom of [Grandmother's] shoes were caked with animal feces that she used to walk through the home and put [them] up on her couch."

were its investigator who removed the child in November 2019, its conservatorship caseworker assigned to the case, Father, and Grandmother. The investigator testified about her concerns with the condition of Grandmother's home when Child was removed, including that she smelled and observed animal feces "throughout the home." The caseworker testified that Mother tested positive for methamphetamine on the day of removal, that the Department's plan was for the fictive kin to adopt Child, and that the Department did not recommend placement with Grandmother. Although the caseworker "saw visible improvement" on subsequent visits to Grandmother's home, she explained that Grandmother's home study was not approved and that the Department remained concerned because Grandmother had allowed Mother, who was abusing drugs, to be left alone with Child. The caseworker further testified that the fictive kin were family friends, and she agreed that they had provided Child with a "safe, stable home," were meeting Child's "emotional and physical needs," and were willing to adopt and allow visits for Grandmother.

The Department's exhibits included the home studies concerning the fictive kin and Grandmother and photographs of Grandmother's home that were taken on the day of the Child's removal. Grandmother's home study stated that her home was not approved because of safety concerns and her inability to provide for Child's "needs (i.e. supervision)." The photographs show that the home was unsanitary and unsafe for Child. In her testimony, Grandmother agreed that the photographs "were not positive at all" but explained that she was "working a lot of hours at that time" and testified about improvements that she had made to the home after the removal. Although Grandmother wanted Child to be placed with her, she testified that she liked the fictive kin and agreed that Child was bonded with them and that they were taking care of Child's needs. She testified that she would like Child to be placed with the fictive

3

kin if the Court did not place Child with her. Grandmother confirmed that Father "cannot pay child support at this time."

The Department's exhibits also included (i) results from Mother's drug tests, including from the day of removal, that showed that she was positive for amphetamine and methamphetamine; (ii) the Department's final report to the trial court; and (iii) the April 2019 indictment and March 2020 judgment convicting Father of aggravated assault with a deadly weapon, a firearm, and sentencing him to eight years' confinement. In addition to this conviction, Father admitted to a prior felony conviction for unlawful restraint of a child under seventeen and to three convictions for assault causing bodily injury to family members, but he explained that the family assault convictions were "[p]lea deals, the only reason why [he] signed them." He spent one year in state jail for the felony conviction for unlawful restraint of a child under seventeen and was serving the eight-year sentence at the time of trial. Father testified that he was eligible for parole in May 2023.

Father confirmed that he was incarcerated when Child was born but testified that he had contact with Mother after Child was born and admitted that he knew Mother "was doing methamphetamines" while Child was in her care. In particular, he testified about a phone call with Mother "around the middle of September [2019]." Father testified that he "heard [Child] screaming" so "obviously there was something wrong there," that he was "pretty sure [Mother and another person were] doing drugs over there," and that he asked Grandmother to go pick up Child on that occasion. Father, however, testified that he did not tell Grandmother "what was really going on" because Grandmother "would have called CPS" and he "was trying to avoid CPS coming into [his life]." He earlier had testified that he did not tell Grandmother that Mother

4

was doing methamphetamine because Grandmother "would have called CPS on her" and he "was trying to keep [Child] from getting taken."

Father also testified on his own behalf, and Grandmother's witnesses were her direct supervisor at work and her grandson who was seventeen years old and lived with her. The evidence showed that significant improvements to Grandmother's home had been made after Child's removal and that Grandmother was employed by a school district and as a caregiver for a disabled child. Her supervisor testified that Grandmother worked with special needs children, that she was "wonderful" with the children, and that they "love" her. The grandson testified about the improved condition of Grandmother's house. Father testified that it was in Child's best interest to be placed with Grandmother and not the fictive kin because he "used to sell drugs to [the fictive kin's] daughter"; that the daughter "does methamphetamines"; and that she "lived there on probation for that, for that and a pistol charge." Father did not have concerns with Child being placed with Grandmother, and it was his desire that Child be placed there. Although Father had never met Child in person because he had been incarcerated, he maintained contact with Child by phone with Grandmother's assistance and had started classes, including "a GED class and Cognitive Intervention for Anger." Father also testified about his conviction for aggravated assault, explaining that he "shot somebody because they pulled a gun on [him] and [Mother] while she was three months' pregnant with [Child] in her stomach" and that he "would do anything for [Child]."

The guardian ad litem opined that it was in Child's best interest to terminate Father's parental rights and for Child to remain in the fictive kin placement. The evidence showed that Father was unable to provide for Child and that Child was safe and being taken care of by the fictive kin who hoped to adopt Child if the parents' rights were terminated and would

5

allow Grandmother to remain a part of Child's life. Consistent with the guardian ad litem's recommendation, the trial court continued Child's placement with the fictive kin and signed the decree terminating parental rights, finding that termination of Father's parental rights was in Child's best interest, *see* Tex. Fam. Code § 161.001(b)(2), and that Father "knowingly placed and knowingly allowed the child to remain in conditions and surroundings which endangers the physical and emotional well-being of child," *id.* § 161.001(b)(1)(D); "engaged in conduct and knowingly placed the child with persons who engaged in conduct which endangers the physical and emotional well-being of the child," *id.* § 161.001(b)(1)(E); and "knowingly engaged in criminal conduct that has resulted in the parent's: 1. conviction of an offense; and 2. confinement or imprisonment and inability to care for the Child for not less than two years from the date of the filing of the petition," *id.* § 161.001(b)(1)(Q). The trial court appointed the Department as the sole managing conservator of Child with permission to place Child for adoption and to consent to the adoption. Father's appeal followed.

## ANALYSIS

### Denial of Access and Possession to Grandmother

In his first and third issues, Father complains about the trial court's decisions concerning Grandmother's intervention in the proceeding and her rights to possession and access to Child. He argues that the trial court abused its discretion or erred when it refused to place Child with Grandmother or appoint her as a conservator and when it omitted reference to Grandmother or her intervention in the decree, effectively denying her access to Child. He argues that there was no evidence or insufficient evidence that denying access to Grandmother was in Child's best interest.

6

"Texas courts have long held that an appealing party cannot complain of errors that do not injuriously affect it or that merely affect the rights of others." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000). Thus, an appealing party lacks standing to challenge these types of alleged errors that affect the rights of others. *See A.P. v. Texas Dep't of Fam. & Protective Servs.*, Nos. 03-18-00780-CV & 03-18-00781-CV, 2019 Tex. App. LEXIS 2268, *2–4 (Tex. App.—Austin Mar. 26, 2019, no pet.) (mem. op.) (concluding that parents did not have standing to challenge trial court's rulings concerning paternal grandmother's petition in intervention and collecting cases in which court concluded that parent did not have standing to complain about alleged error that affected others); *see also Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex. 1993) (stating general test for standing); *In re I.A.B.*, No. 05-17-00497-CV, 2017 Tex. App. LEXIS 10629, at *14–15 (Tex. App.—Dallas Nov. 10, 2017, no pet.) (mem. op.) (concluding that grandmother lacked standing to challenge termination of unknown father's parental rights).

Father's first and third issues complain of alleged error that did not injuriously affect him but affected the rights of Grandmother. Thus, we conclude that he lacks standing to bring these issues. *See A.P.*, 2019 Tex. App. LEXIS 2268, *2–4; *see also In re E.N.J.*, No. 06-15-00019-CV, 2015 Tex. App. LEXIS 8459, at *4 & n.4 (Tex. App.—Texarkana Aug. 13, 2015, no pet.) (mem. op.) (concluding that father did not have standing to raise issue challenging failure of trial court to strike petition in intervention and collecting cases in which "[t]his rule, which concerns standing, has also been applied in parental-rights termination cases by our sister courts of appeals"); *In re L.K.*, No. 12-11-00169-CV, 2012 Tex. App. LEXIS 10569, at *18–19 (Tex. App.—Tyler Dec. 20, 2012, pet. denied) (mem. op.) (concluding that parents could not raise issue concerning trial court's denial of conservatorship of children to

paternal grandparents who were intervenors "when the intervenors have not raised the complaint themselves"); *K.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-11-00354-CV, 2012 Tex. App. LEXIS 6196, at *1, 6 (Tex. App.—Austin July 26, 2012, no pet.) (mem. op.) (explaining that "appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others" and that court was not persuaded that father could raise issue about omission of jury question asking if intervenor sister should be appointed children's conservator "when [sister] has not raised the complaint herself"). On this basis, we overrule Father's first and third issues.

## Termination of Father's Parental Rights

In his second and fourth issues, Father argues that there was no evidence or alternatively insufficient evidence to support the trial court's predicate-grounds and best-interest findings.

### Standard of Review

To terminate parental rights, the Department has the burden to prove one of the predicate grounds in section 161.001(b)(1) of the Texas Family Code and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is the clear and convincing evidence standard. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). The clear and convincing evidence standard is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex.

2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"). Although "parental rights are of constitutional magnitude," "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018); *In re J.F.C.*, 96 S.W.3d at 266. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*; *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (explaining that, in factual sufficiency review, court of appeals "should not supplant [fact-finder]'s judgment with its own").

**Predicate Grounds**

In his fourth issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's predicate-grounds findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (Q). We limit our review to Father's challenge to the sufficiency of the evidence to support the trial court's findings under subsections (D) and (E)—that (i) Father knowingly placed or knowingly allowed Child to remain in conditions or surroundings which endangered Child's physical or emotional well-being, and (ii) Father engaged in conduct or

knowingly placed Child with persons who engaged in conduct which endangered Child's physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis for appeal challenging subsection (D) or (E) findings).

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13–14 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.).

The relevant inquiry under subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted); *see Pruitt*, 2010 Tex. App. LEXIS 10272, at *14. "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re M.E.-M.N.*, 342 S.W.3d at 262. In contrast, the relevant inquiry under subsection (D) is whether the child's environment, including the child's living conditions and conduct by

10

parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* at *10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)).

Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at *11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503). Evidence of Father's endangering course of conduct included his conviction for the felony offense of unlawful restraint of a child under seventeen, his three convictions for assault causing bodily injury to family members, and, when Mother was pregnant with Child, his conviction for aggravated assault with a deadly weapon. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." (citation omitted)); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) ("[I]ntentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child." (citation omitted)). Although Father testified that he was defending Mother and his unborn child when he shot the man and that the "only reason" he "signed" the family assault convictions was because they were "[p]lea deals," the trial court could have found his testimony not credible. *See In re J.J.O.*, 131 S.W.3d 618, 632 (Tex. App.—Fort Worth 2004, no pet.) (noting that, in bench trial, trial court determines credibility of witnesses and weight to be accorded to their testimony); *see also*

11

*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (discussing appellate review of witness credibility issues in context of parental termination case).

Father also admitted that he knew that Mother was using illegal substances but allowed Child to remain in Mother's care. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Pruitt*, 2010 Tex. App. LEXIS 10272, at *21–22 (considering evidence that parent left children with unsuitable person to be relevant to issue of endangerment). After hearing Child "screaming" on a phone call with Mother a few months before Child's removal such that "obviously there was something wrong there," Father testified that he did not tell Grandmother "what was really going on" about Mother's drug use because Grandmother "would have called CPS" and he "was trying to avoid CPS coming into [his life]." He also admitted that he did not tell Grandmother that Mother was doing methamphetamine because Grandmother "would have called CPS on her" and he "was trying to keep [Child] from getting taken." The evidence from the day of removal further supported that Father knowingly had allowed Child to remain in an unsafe home environment under the care of Mother who tested positive for methamphetamine on that day.

After carefully reviewing the record, we conclude that the evidence was legally and factually sufficient to support the trial court's findings under subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232–33, 237; *In re A.C.*, 560 S.W.3d at 630–31. We overrule Father's fourth issue.

12

**Best Interest**

In his second issue, Father challenges the legal and factual sufficiency of the evidence to support that termination of his parental rights was in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(2). Father argues that the Department failed to overcome the presumption that a child's best interest is served by keeping the child with a parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (observing that "there is a strong presumption that the best interest of a child is served by keeping the child with a parent" (citing Tex. Fam. Code § 153.131(b))).

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23.

At the time of trial, Child was approximately thirteen months old and had been living with the fictive kin for nine months. Their home study was approved, and evidence showed that Child was safe, well-cared for, and bonded with them; that they wanted to adopt Child; and that they were willing to allow Grandmother visitation with Child. When asked, the guardian ad litem agreed that termination of parental rights was in the best interest of Child, that Child "should be freed up for adoption" with the fictive kin, and that the fictive kin were capable of caring for Child.

Although Father testified about his concerns with the fictive kin, classes he had started, and his love and positive phone contact with Child, evidence showed that he had never met Child in person, was incarcerated until at least May 2023, and was unable to provide or care for Child. His plan for Child was to be placed with Grandmother, but the Department denied placement with her, providing its reasons for doing so, including concerns about her ability to protect Child and provide for Child's needs. Weighing the conflicting evidence, the trial court could have disbelieved Father's testimony about the fictive kin and credited the Department's evidence. *See In re J.J.O.*, 131 S.W.3d at 632. Further, the trial court could have considered Father's violent criminal history in its best interest determination. *See In re C.H.*, 89 S.W.3d at 27 (explaining that evidence presented to satisfy predicate ground may also be probative of best interest).

Viewing the evidence under the legal sufficiency standard of review, we conclude that the trial court could have formed a firm belief or conviction that terminating the parental rights of Father was in Child's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31; *In re J.F.C.*, 96 S.W.3d at 266. Further, viewing the evidence under the factual sufficiency standard of review, we conclude that the evidence is such that the trial court

14

reasonably could have formed a firm belief or conviction that termination of Father's parental rights was in the best interest of Child. *See In re A.C.*, 560 S.W.3d at 631. Thus, we conclude that the evidence was legally and factually sufficient to support the trial court's best interest finding. We overrule Father's second issue.

## CONCLUSION

For these reasons, we affirm the trial court's decree of termination.

 

 

 

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Triana, and Kelly

Affirmed

Filed: March 2, 2021